UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

EASTON MARK INC.

       *Plaintiff*,

 v.

JORDAN CRUMLEY,
CHRISTOPHER WILLIAMS,
RAYMOND SAHADEO,
NATE WALSH,
CHESTNUT EQUITY PARTNERS RE, LLC.

       *Defendants*.

C.A. No. _____

**<u>JURY TRIAL DEMANDED</u>**

## <u>COMPLAINT</u>

Plaintiff Easton Mark Inc. ("Plaintiff") brings this Complaint against Defendants Jordan Crumley, Christopher Williams, Raymond Sahadeo, Nate Walsh, and Chestnut Equity Partners RE, LLC.

## <u>INTRODUCTION</u>

1.     This action arises from a scheme devised by Defendants – four individuals with years of real estate development experience, and the LLC formed by those individuals – to fraudulently induce Plaintiff to invest over $40 million dollars in real estate transactions in Washington and Massachusetts.

2.     The scheme began in 2020, when Defendants solicited Plaintiff by presenting themselves as well-connected and highly experienced real estate developers and financiers backed by a network of proven professionals. Through an orchestrated scenario, Defendants first secured Plaintiff's trust by showing reliable returns and apparent sophistication with smaller investments. Thereafter, Defendants induced Plaintiff to invest in two real estate transactions by

withholding material information, by making repeated misrepresentations to conceal their wrongdoing, and by making promises they never intended to keep.

3.      In the first transaction, Defendants fraudulently induced Plaintiff to invest nearly $4 million in a real estate development project in Oak Harbor, Washington (the "Oak Harbor Project").  Starting in March 2021, Defendants falsely represented to Plaintiff that the Oak Harbor Project was a safe and simple investment, claiming the work would be led by a highly trustworthy and respected developer who had an established track record of successfully completing projects with one of the nation's largest homebuilders.  Defendants alleged the homebuilder had pre-approved the property for the Oak Harbor Project, and had committed to purchase the property – upon completion by the developer of initial development work – at a predetermined price, for a substantial profit.  Defendants also represented, falsely, that they had secured financing from an institutional lender for the property purchase and the majority of construction costs, and that Plaintiff's investment would be used to supplement that funding.  In reliance on Defendants' representations, in July 2021 Plaintiff wired $3.925 million to an account controlled by Defendants to invest in the Oak Harbor Project.

4.      During their months-long effort to induce Plaintiff to invest in the Oak Harbor Project, Defendants did not disclose that their highly-touted developer was then under indictment for rape, and that in July 2021 – just days before Plaintiff invested – the developer pled guilty to rape.  Moreover, in the months that followed, to prevent Plaintiff from withdrawing from the project or to otherwise take steps to protect its investments, Defendants concealed that the institutional lender from which Defendants purportedly secured financing backed out of the Project; that Defendants never secured the financing they had promised to Plaintiff; and that the homebuilder terminated its agreement to purchase the property.  And, while concealing this

material information, Defendants made repeated, knowing false assurances to Plaintiff that the Project was on track.  Ultimately, the Oak Harbor Project failed and Plaintiff lost its entire investment.  However, even though virtually no development work was ever completed, Defendants expended millions of dollars obtained from Plaintiff and other sources.  After the Oak Harbor Project was placed under a court-ordered receivership and Project banking records were disclosed, Plaintiff first learned that Defendants had misappropriated over $3.4 million from the Project's bank account and transferred the funds to separate accounts controlled by them.

5.     The second transaction giving rise to Plaintiff's claims unfolded across the country at approximately the same time as the Oak Harbor Project.  Defendants induced Plaintiff to invest $30 million in a South Boston real estate development known as the "Dot Ave Project," through the purchase of membership interests in LLCs formed with the Project developer. Defendants concealed that more than $82 million in unauthorized personal guarantees, secured by the Project property, had been issued to prior investors in the Dot Ave Project, with no intention or ability to satisfy those guarantees.  This misconduct resulted in a barrage of lawsuits by the prior investors which prevented the LCCs from obtaining financing for the Dot Ave Project, and resulted in the Project lender bringing foreclosure proceedings which eliminated Plaintiff's interest in the Project.  Plaintiff lost its $30 million initial investment, as well as over $7 million paid by Plaintiff to cover capital calls during the Project, and pay for Project costs.

6.     Through this lawsuit, Plaintiff seeks to recover the damages it incurred as a direct result of Defendants' fraud and other misconduct.

## PARTIES

7.     Plaintiff Easton Mark Inc. ("Plaintiff" or "Easton Mark") is, and at all relevant times has been, a Nevada corporation with its principal place of business at 1981 Fenchurch Court, Las Vegas, Nevada.

8.     Defendant Jordan Crumley ("Crumley") is an individual who, upon information and belief, has at all relevant times resided at 108 1st Street, Melrose, Massachusetts.

9.     Defendant Christopher Williams ("Williams") is an individual who, upon information and belief, has at all relevant times resided at 26914 Middle Golf Drive, El Macero, California.

10.     Defendant Raymond Sahadeo ("Sahadeo") is an individual who, upon information and belief, has at all relevant times resided at 4209 Almond Lane, Davis, California.

11.     Defendant Nate Walsh ("Walsh") is an individual who, upon information and belief, has at all relevant times resided at 2306 S Columbine Street, Denver, Colorado.

12.     Defendant Chestnut Equity Partners RE, LLC ("CEP") is a Massachusetts limited liability company that, upon information and belief, at all relevant times has had a principal place of business at 108 1st Street, Melrose, Massachusetts.  Upon information and belief, Defendants Crumley, Williams, Sahadeo, and Walsh (hereinafter the "Individual Defendants") are, and at all relevant times have been, the sole Members and Managers of CEP (collectively with the Individual Defendants, "Defendants").

13.     Upon information and belief, at all relevant times each Defendant was an agent, employee, partner, or joint-venturer of the other Defendants and was acting within the course and scope of that agency, employment, partnership, or joint-venture, and/or engaged in the conduct alleged herein with the knowledge, consent, or ratification of each other Defendant.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over the subject matter of this case pursuant to 28

U.S.C. § 1332(a) because Plaintiff alleges damages in excess of $75,000, exclusive of interest

and costs, and the parties are citizens of different states.  Plaintiff is a citizen of Nevada, and

CEP is a citizen of Massachusetts. Upon information and belief, the sole Members of CEP are

the four Individual Defendants, none of whom is a citizen of Nevada.

15.     Defendants are subject to *in personam* jurisdiction in Massachusetts, as each

Defendant either resides in or is a citizen of Massachusetts, or engaged in conduct in

Massachusetts giving rise to Plaintiff's claims including, but not limited to, conduct committed

through and on behalf of CEP, a Massachusetts limited liability company.

16.     Venue in this District is proper pursuant to 28 U.S.C. § 1391(b)(2) because a

substantial part of the events giving rise to Plaintiff's claims occurred in this judicial district.

## FACTUAL BACKGROUND

### A.     Background of the Parties

17.     Plaintiff Easton Mark is the real estate investment arm of a small, multi-

generational family office based in Las Vegas.  Plaintiff was founded in 2018, and until 2020 its

business was confined to traditional lending to real estate operators and developers in Nevada,

Arizona, and California.  As detailed below, Defendants knew and exploited the fact that

Plaintiff had minimal experience in preferred equity or general partnership investments involving

real estate.

18.     The Individual Defendants grew up together in Northern California and have

known each other for approximately 25 years. Defendants Sahadeo and Williams still work and

reside in California.  Approximately 10 years ago, Defendant Crumley moved to the Boston area

where he met Defendant Walsh, who upon information and belief was then living in

Massachusetts. The bicoastal nature of Defendants' operations enabled Defendants to carry out their fraud schemes with respect to the Massachusetts and Washington-based transactions at issue in this case.

19.     In 2019, the Individual Defendants formed CEP as a Massachusetts LLC with the stated purpose to "act as a real estate owner and developer for investment purposes and to allow for the purchasing, selling, leasing, renting, building, altering, developing, repairing and managing real estate[.]"

20.     Upon information and belief, the four Individual Defendants are CEP's sole Members and Managers.

21.      CEP initially had an office on Newbury Street, Boston, but the Individual Defendants subsequently moved CEP to Crumley's home in Melrose, Massachusetts.

22.     Before forming CEP, each Individual Defendant had significant business experience, and each brought different skill sets to the fraud scheme employed against Plaintiff.

23.     Crumley has a real estate background and has described himself as having "a genuine passion for deal making." Crumley serves as CEP's East Coast relationship manager and "face man."

24.     Sahadeo serves as CEP's West Coast relationship manager, and focuses on identifying investment opportunities in that region.

25.     Walsh has a financial services background and has worked at financial firms such as Goldman Sachs. Walsh manages investor relations for CEP.

26.     Williams is a licensed contractor and real estate broker.

27.     In material posted on the CEP website as early as July 2020, Defendants represented to potential investors like Plaintiff that CEP was a "real estate partnership with deep

expertise in opportunistic, value-add investments and a keen focus on downside risk." Defendants further represented that CEP's investment strategy was predicated on three "key values" – namely, "large margins of safety," "long-term focus," and "exceptional character"; that they personally held themselves to "the highest standards of personal and professional character [and] choose to only associate with people who do the same"; and that CEP filled a critical gap in a market traditionally dominated by large-scale institutional investors, by "bringing professional sophistication to deals that are too small to attract institutional competition."

28.    In reality, Defendants conducted a fraudulent business that bore no resemblance to the "key values" or investment strategy that Defendants cited on CEP's website to lure investors like Plaintiff.

**B.    Defendants' Initial Solicitation of Plaintiff**

29.    In the summer of 2020, in Boston, Defendant Crumley met one of Plaintiff's executives, Adam Crowson, and learned that Plaintiff was seeking to expand its portfolio and presence.

30.    Between July 2020 and March 2022, Defendants solicited Plaintiff to invest in projects CEP was pursuing.  As part of these solicitation efforts, Crumley and Sahadeo met personally in Massachusetts with Plaintiff, through Adam Crowson and Plaintiff's then-President.  In addition, the Individual Defendants repeatedly communicated with Plaintiff in Massachusetts by telephone and in virtual meetings.

31.    During these communications, Defendants represented to Plaintiff that CEP had close relationships with sophisticated real estate investors and developers, and alleged that CEP's founders (i.e., the Individual Defendants) had an experienced, high-quality network of lenders

and contractors, were closely attuned to CEP's markets, and had both access to "proprietary deals" and "the ability to repurpose and effectively manage assets."

32.     During the above communications, Defendants learned that Plaintiff had minimal experience in preferred equity or general partnership investments involving real estate, and was not in a position to operate a development project.  Defendants exploited this information, with Crumley representing to Plaintiff that CEP's alleged expertise in real estate financing, construction, and development made CEP the ideal partner for Plaintiff.

33.     To gain Plaintiff's trust, Defendants initially presented Plaintiff with the opportunity to invest in smaller projects.  By fulfilling their initial commitments to Plaintiff with respect to those projects, Defendants set the stage to induce Plaintiff to invest much larger sums in the transactions that are subject of this lawsuit.

**1.     Chestnut Capital Fund Investment**

34.     First, in August 2020, Defendants persuaded Plaintiff to invest $200,000 in the "Chestnut Capital Fund," a CEP-managed fund with ownership stakes in various multi-family developments.  Defendants promised the Chestnut Capital Fund would yield fixed quarterly returns over a one-year term, at which point Plaintiff would be repaid the principal amount of its investment plus interest.

35.     Defendants made the required payments owed to Plaintiff with respect to the Chestnut Capital Fund investment.

**2.     Loans For Ipswich Projects**

36.     A few months later, in December 2020, Defendants convinced Plaintiff to make two one-year bridge loans – one for $225,000, and the second for $780,000 – to finance development projects in Ipswich, Massachusetts.

8

37.     As in the case of the Chestnut Capital Fund, Defendants fulfilled their commitments to Plaintiff on those projects, repaying the principal amount loaned along with a 15% return.

**3.     <u>CJRI Project</u>**

38.     Next, in early 2021, Crumley and Williams asked Plaintiff to make a $600,000 loan to be used in connection with a Rhode Island workforce housing project.

39.     Crumley and Williams represented to Plaintiff that as collateral for the loan, they would pledge a portion of their interest in CJ RI Apartments, LLC ("CJRI"), a Rhode Island LLC in which Crumley and Williams together held 100% of the membership interests.  CJRI is a 33.33% owner/Member of Bluefin Holdings, LLC ("Bluefin"), which owns real estate being developed as part of a workforce housing project. CJRI also is a 50% owner of Greenfin Properties, LLC ("Greenfin"), which likewise owns real estate developed as workforce housing.

40.     Plaintiff agreed to make the loan, and on February 19, 2021 Crumley and Williams executed a three-year promissory note (the "C/W Promissory Note") by which they assumed a joint and several obligation to make monthly, interest-only payments of $7,500 for three years, and at the loan maturity date (February 19, 2024) to repay the outstanding principal balance in full together with any unpaid interest.  Crumley and Williams also executed a pledge agreement (the "C/W Pledge Agreement"), pursuant to which they pledged, as collateral for the loan, a 40% membership interest in CJRI (the "Collateral").

41.     On February 22, 2021, Plaintiff – at Crumley and William's direction – wired the $600,000 in loan funds to an account held in Crumley's name at JPMorgan Chase Bank (the "Crumley Chase Account").

42.     During the three-year term of the loan, Crumley and Williams made the $7,500 monthly payments under the C/W Promissory Note.  Prior to the maturity date, Crumley and Williams asked to extend the maturity date by one year.  No agreement was reached to extend the maturity date, and Crumley and Williams breached their repayment obligations under the C/W Promissory Note.

43.     On March 28. 2025, Plaintiff informed Crumley and Williams that the Collateral – the 40% membership interest in CJRI – would be sold at auction.  Following auction proceedings in April 2025, Plaintiff was the successful bidder with respect to the Collateral.

**C.     The Oak Harbor Project**

44.     By early 2021, through the smaller projects described above, Defendants succeeded in convincing Plaintiff that CEP was a trustworthy, sophisticated partner that could deliver on its promises.

45.     Against this backdrop, in March 2021 Defendants solicited Plaintiff to invest in the Oak Harbor Project, a residential development in Oak Harbor, Washington.  Ultimately, as detailed below, on July 13, 2021, Plaintiff invested $3.925 million in the Project after Defendants misrepresented and concealed material facts concerning, among other things, the individuals that would develop, manage, and finance the Project, and the use of funds that Plaintiffs would invest.  Then, after Plaintiff invested, Defendants concealed their misuse of Project funds, and also withheld information concerning other material events – including lender foreclosure proceedings – which led to the Project's failure.

**1.     Defendants' Inducement of Plaintiff to Invest in the Oak Harbor Project**

46.     In March 2021, Defendants first contacted Plaintiff about the Oak Harbor Project.

47.    On March 11, 2021, Crumley emailed Adam Crowson and alleged that he and his "West Coast partners" were "connected" to a Washington builder who was seeking financing for a real estate development project with D.R. Horton, one of the largest home construction companies in the United States.  Crumley alleged that Defendants had vetted the developer and concluded he had "good experience and demeanor," would be "a good long-term partner," and was "one of the more 'clear eyed' and 'realistic' builders I've come across."

48.    During subsequent virtual meetings, telephone conferences, and email exchanged in March 2021, Crumley (who was then in Boston), and Sahadeo and Williams (who upon formation and belief were then in California), solicited Adam Crowson and Plaintiff's then President to invest in the Oak Harbor Project.  In addition, on multiple occasions starting in March 2021, Sahadeo flew to Boston to join Crumley in face-to-face meetings with Adam Crowson and Plaintiff's then President.

49.    During these in person and virtual meetings, telephone conferences, and in email, Defendants identified the developer of the Oak Harbor Project as Richard Darren Ludwigsen ("Ludwigsen"), and represented that that the Project involved the development of two parcels of raw land ("the Oak Harbor Property") into a 135-lot residential subdivision.  Defendants alleged that Ludwigsen had entered into a letter of intent with D.R. Horton, and that D.R. Horton had committed to purchase the Oak Harbor Property for a "compelling margin" after Ludwigsen completed initial development tasks.  Defendants represented that D.R. Horton and Ludwigsen had done numerous similar transactions, and that D.R. Horton had picked the specific property for this new development.

50.    Furthermore, Sahadeo represented that he personally had a strong relationship with Ludwigsen, and that the Oak Harbor Project would be patterned on Ludwigsen's prior

successful projects with D.R. Horton, in which D.R. Horton had pre-approved the raw land to be developed; Ludwigsen had acquired the land and developed it to D.R. Horton's specifications – using Ludwigsen's own construction expertise as well as subcontractors preferred by D.R. Horton; and D.R. Horton had purchased the developed lots at a previously negotiated price.

51.     Sahadeo also represented that Defendants had done their own due diligence on Ludwigsen and D.R. Horton, and that each was fully committed to the Oak Harbor Project. In addition, Sahadeo and Crumley represented to Plaintiff that the Oak Harbor Project was a "no-risk" investment specifically because D.R. Horton had committed to purchasing 135 finished lots for over $20 million, and because Ludwigsen had a record of developing land to meet D.R. Horton's expectations.

52.     The two parcels of raw land comprising the Oak Harbor Property were then owned by two entities – Garry Oaks, LLC and Claire Conaway, Trustee of the Claire Conaway Family Trust (collectively the "Property Owners").  Defendants represented to Plaintiff that Ludwigsen already had an institutional lender, Setanta Development Capital ("Setanta"), to finance the acquisition of the Oak Harbor Property and the majority of the construction costs, but that Ludwigsen needed additional funding to pay for a small portion of the construction costs. Defendants alleged that Ludwigsen had agreed to share the Oak Harbor Project's proceeds with CEP if CEP obtained capital needed for additional construction costs.

53.     Defendants represented that Ludwigsen required $3.925 million in additional funding, and it was this amount that Defendants solicited Plaintiff to invest. Defendants assured Plaintiff that obtaining the final $3.925 million in construction financing was all that was needed for the Project to move forward.

2.    **Concealment of Ludwigsen's Pending Rape Charge and Conviction**

54.    When Defendants were soliciting Plaintiff to invest in the Oak Harbor Project, they did not disclose – and Plaintiff did not know – that approximately three years earlier in 2018, Ludwigsen had been arrested and charged with rape.  At the time of Defendants' solicitations this charge was still pending, creating enormous risk with respect to both the viability of any project involving Ludwigsen and Ludwigsen's ability to perform.  On information and belief, Defendants knew Ludwigsen had been arrested on these charges in 2018.  Nevertheless, when Defendants solicited Plaintiff they concealed this information.  (As detailed below, Defendants later concealed that on July 8, 2021, Ludwigsen pled guilty to this charge, and in December 2021 was incarcerated.)

3.    **Oaks Village 135 LLC**

55.    Ultimately, Defendants registered an LLC, Oaks Village 135 LLC ("Oaks Village"), to serve as the entity that would purchase the Oak Harbor Property from the Property Owners, and – once development work was completed –sell the Property to D. R. Horton.  Crumley, Williams, and Sahadeo were the sole Managers of Oaks Village, and CEP was one of two Members.  Defendants used Oaks Village to orchestrate Plaintiff's investment in the Oak Harbor Project, inducing Plaintiff to pay $3.925 million in July 2021 acquire a preferred membership interest in Oaks Village.

56.    As detailed below, Oaks Village closed on the purchase of the Oak Harbor Property on July 23, 2021.  Months earlier on April 13, 2021, while Defendants were still soliciting Plaintiff to invest, Crumley sent Plaintiff a draft purchase and sale agreement ("PSA") respecting D.R. Horton's future purchase of the Oak Harbor Property from Oaks Village for

$20.925 million.  Crumley represented to Plaintiff that the PSA was good news as it underscored D.R. Horton's commitment to the Oak Harbor Project.

57.     On May 6, 2021, D.R. Horton (acting through an entity called SSHI LLC) signed the PSA, which set forth conditions necessary for the sale to close at the purchase price of $20.925 million.  One condition was that the development and construction work must have achieved "substantial completion," to include: delivery of a recorded version of the final plat approved by all applicable government authorities; completion of all plat construction requirements, with approval by the applicable government authority; construction of required fencing; installation and approval of required mail facilities; installation of all required utility connections; and installation of all required road and surface improvements.

58.     On June 10, 2021, in furtherance of Defendants' representations that they were securing financing from Setanta for the property purchase and the majority of construction costs, Crumley emailed Plaintiff a Setanta term sheet executed on behalf of Oaks Village on June 9, 2021.  The term sheet contemplated a loan in the amount of $12 million, to be used for land acquisition and construction.  In the email, Crumley alleged that Defendants had asked Setanta to increase the loan amount.  Crumley separately alleged that the loan would close as soon as such increase was approved.

59.     Defendants concealed from Plaintiff that Defendants were then negotiating with numerous other lenders, for significantly smaller loans and for hard money loans, and that Defendants did not intend to close with Setanta for at least two reasons.

60.     First, Defendants had no intention of obtaining a construction loan from Setanta, since the release of funds under a construction loan would be tied to construction milestones and Defendants did not intend to perform any actual construction as part of the Oak Harbor Project.

61.    Second, Defendants knew Setanta would require – as a condition of final loan approval – a completion guaranty from Ludwigsen, and Defendants knew Ludwigsen would be disqualified as soon as Setanta performed any type of background check.

**4.    Plaintiff's Purchase of Oaks Village Preferred Membership Units**

62.    On July 9, 2021, Defendants represented to Plaintiff that Setanta had come through with an updated term sheet for increased loan funding.  In a text message sent to Adam Crowson on that date, Crumley alleged "We are good to go."

63.    In reliance on Defendants' representations concerning the Oak Harbor Project, including Crumley's latest representation that the Setanta loan was ready to close and that time was now of the essence, Plaintiff agreed to invest $3.925 million in the Project through the purchase of membership units in Oaks Village.

64.    On July 9, 2021, in connection with Plaintiff's investment, Plaintiff (through its then President) and CEP (through Crumley) executed the Oaks Village Operating Agreement, which had been drafted by CEP's attorneys.[1]

65.    Also on July 9, 2021, Plaintiff began the process of wiring $3.925 million to an Oaks Village account with JPMorgan Chase Bank (the "Oaks Chase Account"). The transfer was completed on July 13, 2021.  Prior to Plaintiff's investment, the Oaks Chase Account had a balance of only $100.

66.    Plaintiff never had any control over or even visibility into the Oaks Chase Account.  The Oaks Chase Account was managed primarily by Crumley, who had the monthly statements mailed to his home address in Massachusetts.

---

[1] On June 23, 2021, CEP's attorneys had registered Oaks Village as a Washington LLC.

67.     Pursuant to the Oaks Village Operating Agreement, Oaks Village has two Members, Plaintiff and CEP, and 1,000 Membership Units comprised of 90 Preferred Units and 910 Common Units.  Under the Operating Agreement, Plaintiff holds 100% of the Preferred Units, acquired for a contribution amount of $3.925 million, and CEP holds 100% of the Common Units for which it did not pay any consideration.[2]

**5.     Defendants' Continued Misrepresentations and Concealments Concerning Ludwigsen and Project Financing**

68.     As noted above, Defendants had led Plaintiff to believe that the timing of its investment was important, as Plaintiff's funds allegedly would trigger Setanta to provide at least $12 million in additional funding required to purchase the Oak Harbor Property and complete development of the 135 lots to D.R. Horton's specifications.

69.     However, Plaintiff only subsequently learned that timing of its investment was important to Defendants for other reasons that Defendants withheld from Plaintiff.

70.     Unknown to Plaintiff, on or about July 8, 2021 – before Plaintiff's signed the Oaks Village Operating Agreement and began wiring funds to the Oaks Chase Account – Ludwigsen pled guilty to felony rape and was required to register as a sex offender. His sentencing hearing was set for October 2021, and he was incarcerated starting in December 2021.  Defendants did not disclose any of these material facts to Plaintiff.

71.     Defendants waited until July 10, 2021, one day after Plaintiff signed the Oaks Village Operating Agreement and began wiring funds to the Oaks Chase Account, to inform of Plaintiff that Ludwigsen had legal problems.  Even then, however, Sahadeo and Crumley only

---

[2] Defendants did not disclose, and Plaintiff only recently learned, that Defendants accepted money from at least one other investor in the Oak Harbor Project – $200,000 that was deposited into the Oaks Chase Account on July 27, 2021.  Defendants have not disclosed what they promised to this investor in exchange for the $200,000.

disclosed that Ludwigsen was facing unspecified "personal legal problems," and in a July 10, 2021 text message Crumley falsely represented to Adam Crowson that it was "all good stuff." Crumley and Sahadeo both assured Plaintiff that all aspects of the Oak Harbor Project were moving forward as planned.

72.    Defendants did not disclose, and Plaintiff only recently learned, that Ludwigsen's legal problems were in fact life-altering, and entailed a sentence that would prevent him from participating in the Oak Harbor Project that was (supposedly) about to begin.

73.    On information and belief, Defendants knew of the pending rape charge against Ludwigsen from the time Defendants first solicited Plaintiff to invest in the Oak Harbor Project, yet intentionally withheld the information from Plaintiff.

74.    Defendants also continued to misrepresent and conceal from Plaintiff material information concerning financing for the Oak Harbor Project, and their expenditure of Plaintiff's funds.

75.    As noted, prior to Plaintiff's investment, Defendants specifically represented that it had secured financing from Setanta for all funds required to purchase the Oak Harbor Property and for the majority of the construction costs, and that Plaintiff's $3.925 million was required to fund the balance of the construction costs. Defendants also represented that Setanta had committed to provide at least $12 million in funding once Plaintiff's investment had been made. These representations proved false. Defendants had not actually committed to obtaining the Setanta loan. Nor had they committed to obtaining comparable financing from any other lender, and they did not do so.

76.    On July 14, 2021 – the day after Plaintiff's $3.925 million appeared in the Oaks Chase Account – Defendants transferred $2.73 million of those funds to an escrow account to

17

pay acquisition costs for the Oak Harbor Property.  At that time, Defendants represented to Plaintiff that the money was being transferred as a down payment required by the Property Owners in order to extend the date of the acquisition closing.  Thus, as characterized by Defendants, the $2.73 million was essentially a bridge loan until the Setanta loan (which purportedly was to include funding for the property acquisition) closed.

77.     On July 21, 2021, Crumley and Sahadeo held a celebratory "closing" dinner in Boston with Adam Crowson and Plaintiff's then President.  Crumley and Sahadeo represented that the closing being celebrated was both the consummation of the investment of Plaintiff's funds and the Setanta loan, which Defendants had alleged was due to close any day.

78.     Two days later on July 23, 2021, Defendants closed on Oaks Village's purchase of the Oak Harbor Property for approximately $5.2 million. Defendants did not disclose the closing to Plaintiff.  Moreover, Defendants did not disclose that Setanta had not financed the purchase, and that they instead had combined Plaintiff's $3.925 million with a $2.55 million hard money loan from WADOT Capital, Inc. ("WADOT"), secured by a deed of trust on the Property. Defendants obtained no other financing for the property purchase.

79.     Furthermore, Defendants did not disclose that in or about late July 2021, Setanta cancelled its term sheet and backed out of the deal entirely.

80.     If Defendants had disclosed that they had obtained only $2.55 million in third-party financing for the Oak Harbor Project (as opposed to the at least $12 million in Setanta funding that Defendants had represented to Plaintiff), Plaintiff never would have invested its own $3.925 million into the Project.

81.     Plaintiff knew that in addition to its $3.925 million, the Oak Harbor Project required at least $12 million to acquire the land and complete construction of the 135 lots to be

18

sold to D.R. Horton. Budgets that Defendants had previously disclosed to Plaintiff projected that the Project costs would total $15.6 million. Accordingly, the $2.55 million from WADOT covered only a portion of the land acquisition costs, and did not provide any capital to use towards construction or development costs.

82.     Similarly, if Defendants had disclosed they intended to use Plaintiff's $3.925 million to finance the land acquisition, Plaintiff would have demanded a secured position.

83.     In late July 2021, weeks after they had obtained Plaintiff's funds, Defendants alleged they purportedly were considering, as part of a backup plan, alternative lenders to Setanta. Defendants did not inform Plaintiff that Setanta canceled its term sheet and backed out of the Project.

84.     Next, in an email to Plaintiff dated August 4, 2021, Defendants alleged that they were considering using WADOT as a "cheaper, local, and faster" alternative to Setanta, and that closing on a WADOT loan could occur "in a week or two." Defendants did not disclose that they already had used WADOT funding to pay for a ***portion*** of the property purchase. Moreover, Defendants did not disclose that the terms of the WADOT loan were materially different from the earlier term sheet from Setanta, and that the WADOT loan was insufficient to pay for the property purchase, let alone fund the development of the Oak Harbor Project.

85.     In the same August 4, 2021 email, Defendants also disclosed that they were taking steps to have a $2.025 million earnest money deposit from D.R. Horton – which was sitting in an escrow account pursuant to the PSA – released to Oaks Village, and that they intended to pay Ludwigsen $375,000 as a one-time buyout fee. Following the email, Defendants represented to Plaintiff that the buyout was necessary because Setanta would not provide

financing if Ludwigsen was involved in the Project, but that Setanta would consider working with Defendants once Ludwigsen had been "bought out."

86.    Moreover, Defendants assured Plaintiff that once Ludwigsen was gone, Sahadeo would take Ludwigsen's place in managing the Project development and construction, including hiring subcontractors based on referrals from D.R. Horton.  Defendants represented that Sahadeo was prepared to relocate to Washington to oversee the work, and that the Project would proceed on schedule.  As demonstrated by the facts set forth below, Defendants never had any intention for Sahadeo to perform the role of Project manager, Sahadeo did not perform that role, and he was not qualified to do so.

87.    On August 4, 2021, Defendants transferred $375,000 from the Oaks Chase Account as Ludwigsen's buyout fee.  Then, on August 31, 2021, D.R. Horton's earnest money deposit of $2.025 million, secured by a second deed of trust on the Oak Harbor Property, was transferred from escrow into the Oaks Chase Account.  Defendants falsely represented to Plaintiff that they had financing in place to cover both the additional debt incurred to D.R. Horton, and replace the hundreds of thousands of dollars in expenditures that Defendants had already made from Plaintiff's $3.925 million investment.

**6.    Defendants' Misrepresentations and Concealments Regarding the Project Status**

88.    From August of 2021 through the end of 2022, Defendants gave Plaintiff no indication that the Oak Harbor Project was behind schedule or in any sort of jeopardy.  Instead, Defendants provided Plaintiff with periodic status reports which represented that the Project was progressing, and that Sahadeo and his team were working closely with D.R. Horton.  These representations were false.  During this period, upon information and belief, Defendants

accomplished virtually nothing on the Oak Harbor Project, other than to drain the Oaks Chase Account.

89.     Moreover, Defendants actively concealed from Plaintiff information to show that the Oak Harbor Project was failing.

90.     Specifically, Defendants did not disclose to Plaintiff that within six months of receiving Plaintiff's $3.925 million, Defendants had drained the Oaks Village of nearly all of its funds.  Unknown to Plaintiff, as of December 31, 2021, the Oaks Chase Account had an ending balance of just $1,149.75. [3]  This represented a staggering depletion, considering that between July 2021 and August 2021, Defendants had taken in funds exceeding $8.5 million, including $3.925 million from Plaintiff, $2.55 million from WADOT, and $2.025 million from D.R. Horton. The Oaks Chase Account had minimal activity after December 2021.

91.     In addition, Defendants failed to disclose to Plaintiff that in August 2022, Oaks Village defaulted on its loan with WADOT.

92.     Furthermore, Defendants did not disclose to Plaintiff that on September 16, 2022, D.R. Horton terminated the PSA due to Oaks Village's failure to achieve substantial completion by the required deadline.

93.     Accordingly, by September 2022, with the Oak Harbor Property in foreclosure and no viable opportunity to develop and sell the Property, the Oak Harbor Project was effectively dead.  However, Defendants concealed this information from Plaintiff.

94.     It was not until late September 2022 that Defendants first provided Plaintiff with any indication of Project delays.  In a September 23, 2022 email to Plaintiff, Sahadeo alleged

---

[3] As detailed below, in September 2023, in Plaintiff first obtained banking records to show Defendants' misappropriation of funds from the Oaks Chase Account.

only that the Oak Harbor Project was "on a brief construction hold" while awaiting "updated engineering" from D.R. Horton (which by then had already cancelled its PSA with Oaks Village), and alleged further that "the relationship is great" with Defendants' principal contact with D.R. Horton.

95.     In the months that followed, Defendants continued to falsely represent to Plaintiff that the Oak Harbor Project was still making progress.  In January 2023, Defendants sent emails to Plaintiff which specifically referenced an ongoing contract with D.R. Horton, despite Defendants' knowledge that D.R. Horton had cancelled the P&S.  Defendants also represented that CEP had invested $700,000 of its own money into the Oak Harbor Project, although there is no evidence that this is true.

96.     Furthermore, on April 6, 2023, Defendants, through Williams, provided Plaintiff with a memorandum specifically representing that the final subdivision plat map for the Oak Harbor Project was ready to be submitted to the City of Oak Harbor.  This representation was false; as described below, Plaintiff later learned that as of April 2023 the Oak Harbor Project was nowhere near obtaining such approval.

97.     Defendants' motivation for withholding key information and suppressing the truth from Plaintiff is obvious. Defendants wanted to keep taking advantage of Plaintiff as long as they could.  As set forth below, while representing to Plaintiff that the Oak Harbor Project was progressing as planned, Defendants induced Plaintiff to participate in an additional investment scheme that also was doomed to failure.

**7.     Disclosure of Defendants' Misconduct Regarding the Oak Harbor Project**

98.     In early 2023 Plaintiff first learned that the Oak Harbor Project was in trouble, and that Defendants had not financed the Project in the manner they represented to Plaintiff.

22

99.     On January 18, 2023, Plaintiff received an email from Sahadeo recommending, supposedly at D.R. Horton's urging, that Oaks Village should buy out the senior lender on the Project for $3 million so that Oaks Village could "control our fate" and "preserve our equity." Sahadeo made passing reference to the fact that "the note has matured," while also representing that he was in ongoing talks with the lender and with multiple funding sources to secure a buyout of the note.

100.    On or about March 16, 2023, just weeks before WADOT was scheduled to foreclose on the Oak Harbor Property, Defendants, through Sahadeo, first disclosed to Plaintiff that Defendants had not financed the Oak Harbor Project in the manner promised when they induced Plaintiff to invest. Specifically, Sahadeo then admitted that rather than borrowing $12 million from Setantra or other legitimate construction finance source to pay for all acquisition and most development costs, Defendants had caused Oaks Village to borrow only $2.55 million from a hard money lender, WADOT, which had disbursed the loan proceeds without any of the controls that would have been imposed by a construction lender. Moreover, Sahadeo disclosed that the WADOT loan was already in default and the Oak Harbor Property was in foreclosure.

101.    Because its loan was secured by a first deed of trust, WADOT commenced a nonjudicial foreclosure action and scheduled a foreclosure sale for May 2023. When Plaintiff finally obtained a copy of the Notice of Trustee's Sale, it learned not only that the WADOT loan had matured on August 1, 2022, but also that Defendants had failed to pay the 2021 and 2022 real estate taxes due on the Oak Harbor Property.

102.    On or about March 13, 2023, Sahadeo had provided Plaintiff with access to a database of documents related to Oaks Village, which Plaintiff had never seen before. Then on or about April 7, 2023, Sahadeo and Adam Crowson spoke by phone to review the documents. It

was during this phone call that Sahadeo revealed, for the first time, that D.R. Horton had terminated the PSA and demanded repayment of its earnest money deposit.

103.    Sahadeo also disclosed during the call the construction budget to complete the Oak Harbor Project as of April 7, 2023 was substantially the same as when the Project began, despite Defendants having had received approximately over $3 million to complete this work. In reviewing the work done to date, Sahadeo assured Plaintiff, among other things, that: (a) entitlements for the Project had been received, (b) a preliminary plat had been approved, (c) the Project was ready for horizontal development, and (d) the preliminary plat approvals were good for five years with the potential for a one year renewal. All of these statements were lies.

104.    In order to avoid foreclosure and preserve its interest in the Oak Harbor Property and the development Project, Plaintiff sought the appointment of a receiver over Oaks Village, which by that time was an "administratively dissolved" Washington LLC. At that time, Plaintiff still believed – as a result of Defendants' misrepresentations – that a preliminary plat map, water management plans, and grading plans had been approved by the City of Oak Harbor, that the Project was ready for physical development and construction, and that a final plat was ready to be submitted to the City for approval. More specifically, at the time Plaintiff petitioned the Court for appointment of a receiver, it believed that Defendants had paid approximately $4 million in development expenses which added to the Property's value.

105.    On May 4, 2023, a Superior Court of the State of Washington issued an order appointing a general receiver over Oaks Village and its assets, including the Oak Harbor Property.

106.    Once the receiver was in place, the actual status of the Oak Harbor Project was finally disclosed to Plaintiff. At that time, the receiver took control of the Oaks Village bank

accounts and Plaintiff engaged a new engineer to work with the City of Oak Harbor. Plaintiff learned that the money was gone and the Project was too far behind to save.

107.    For example, despite Defendants' repeated representations to the contrary, only a preliminary plat had been approved; during the City's engineering review, over 300 comments on the construction plans had been returned to Defendants, and no progress had been made in addressing the City's concerns; and even basic tasks like clearing, grubbing, and demolition which Defendants represented had been completed in 2022 still remained unfinished. Ultimately, was is impossible to square the millions of dollars that Defendants obtained for the Project, and completely depleted within a matter of months, with the work actually performed on the Project.

108.    In November 2023, a broker price opinion obtained through the receiver valued the Oak Harbor Property as-is at $2,350 million, significantly less than the $5.2 million that Oaks Village paid.

109.    For the first time during the receivership, Plaintiff also obtained copies of the monthly statements for the Oaks Chase Account – not from Defendants, although the statements had been mailed to Crumley's home address, but through JPMorgan Chase's September 2023 response to a subpoena by the receiver. Despite Plaintiff's $3.925 million investment, Defendants had never provided Plaintiff with any visibility into Oaks Village's operations and had never allowed it to see any of Oak Village's books or records.[4]

110.    The bank statements for the Oaks Chase Account reveal that Plaintiff's investment was not used towards development or construction of the Oak Harbor Project. Instead, the majority of the funds in the account were siphoned into three other accounts: the

_____

[4] Although the Washington Superior Court in the receivership action ordered CEP to produce certain financial records, CEP never complied with the Court's order and was sanctioned for its failure to comply.

Crumley Chase Account, which as describe above is the account into which Plaintiff's $600,000 to Crumley and Williams was transferred; an account associated with CEP; and a third account that, on information and belief, is a personal account controlled by Sahadeo.

111.    For example, in the period of just six months between July 1, 2021 and December 31, 2021, Defendants transferred a total of $3,487,262 the Oaks Chase Account to Sahadeo's account, in 61 separate transactions.

112.    In addition, between November 2021 and December 2021, Defendants transferred $90,000 from the Oaks Chase Account to the Crumley Chase Account (and later transferred $85,000 from the Crumley Chase Account to the Oaks Chase Account).

113.    Moreover, in October 2022, Defendants transferred another $15,000 from the Oaks Chase Account to the law firm representing Crumley in unrelated litigation arising from the Dot Ave Project (described below).

114.     In effect, Defendants used the Oaks Chase Account, and Plaintiff's money, as their personal piggy bank and, in total, drained the Oaks Chase Account without providing any accounting to Plaintiff. There is also no evidence whatsoever that CEP ever put its own $700,000 into the project as represented to Plaintiff.

115.    Once the true state of affairs came to light, the secured creditors (assignees of WADOT) filed a motion to lift the receivership stay so that they could proceed with a non-judicial foreclosure sale. The motion, which was based on the fact that the Oak Harbor Property had no equity and was nowhere near ready for final plat approval, was granted.

116.    Today, the Property owned by Oaks Village has been foreclosed, and Plaintiff has not seen any of its $3.925 million investment returned.

D.    **The Dot Ave Project**

117.    Starting in or about July 2021, before Defendants' malfeasance with respect to the Oak Harbor Project came to light, Defendants began soliciting Plaintiff to invest the Dot Ave Project, a far larger real estate project that concerned the development of property in South Boston into a large life sciences campus.

118.    Defendants represented to Plaintiff that the owner/developer of the South Boston Property (the "SB Developer") was seeking to refinance the Project, and required $30 million to extend a distressed loan with the senior lender (Columbia Pacific) that had funded the purchase of six parcels of land in South Boston for the Project ("Parcels 1-6"), and to acquire an additional parcel of land ("Parcel 8").

119.    Defendants represented that the SB Developer was then seeking to refinance the Dot Ave Project with new lenders, and Plaintiff's investment would be part of the restructured Project upon refinancing.  Specifically, Defendants represented that Plaintiff's $30 million investment would, upon closing of refinancing, convert into membership interests in two LLCs that would be formed to hold Parcels 1-6 and Parcel 8.  As detailed below, those LLCs are Last Mile Boston, LLC ("Last Mile I"), and Last Mile Boston II, LLC ("Last Mile II") [collectively the "Last Mile LLCs"].

120.    Defendants' proposed $30 million investment in the Dot Ave Project was larger than any investment Plaintiff had made previously.  Moreover, Plaintiff maintained its desire to solely invest in and not operate real estate projects in which it invested.  Accordingly, in agreeing to invest in the Dot Ave Project, Plaintiff relied on Defendants' representation that CEP would be Plaintiff's eyes and ears on the ground with respect to the Project.

121.    Toward that end, on August 25, 2021, Plaintiff entered into a Consulting Agreement with CEP whereby CEP agreed "to provide consultative and advisory services" to Plaintiff with respect to the Dot Ave Project.  Defendants had a strong financial motive to induce Plaintiff to invest in the Dot Ave Project, since under the Consulting Agreement Defendants, through CEP, were entitled to a percentage of Plaintiff's net interest in the Project's proceeds.

122.    Also on August 25, 2021, Plaintiff invested $30 million into the Dot Ave Project, and received from the SB Developer a $30 million promissory note (the "$30 Million Note") secured by a second mortgage on Parcels 1-6.  The $30 Million Note accrued a fixed-interest payment of $12 million, due prior to the closing of the refinancing.

123.    On March 23, 2022, the refinancing of the Dot Ave Project closed with a new senior lender, Cottonwood Group, as well as a mezzanine lender, EMI.  The Cottonwood loan, for $130 million, and the EMI mezzanine loan, for $30 million, each had a one-year term and repayment was due by March 22, 2023.

124.    As a condition of the closing, Plaintiff was required to release its secured interest in Parcels 1-6.  Title to these parcels, along with newly-acquired Parcel 8 (collectively the "Last Mile Property") was transferred – subject to security interest held by Cottonwood and EMI – to the Last Mile LLCs. (Parcels 1-6 were conveyed to Last Mile I, and Parcel 8 was conveyed to Last Mile II.)

125.    In addition, Plaintiff's $30 million investment was converted to membership interests in the Last Mile LLCs, specifically, a 33.3% interest in Last Mile I, and a 37.5% membership interest in Last Mile II.  The Last Mile LLCs issued a new promissory note assuming the obligation to make the $12 million fixed-interest payment to Plaintiff.

126.    Plaintiff is one of two Members in the Last Mile LLCs.  The other Member is the SB Developer, which holds 66.6% and 62.5% of the membership interests in Last Mile I and Last Mile II, respectively.

127.    The Operating Agreements for the Last Mile LLCs (collectively "LM Operating Agreements") are substantially the same.[5]  Under the LM Operating Agreements, management of the Last Mile LLCs is shared 50/50 by Plaintiff and the SB Developer, and each is on the Last Mile LLCs' Board of Managers.  Crumley also was appointed to Last Mile I's Board as Consent Manager, and his authority was limited to acting as a tie-breaker in the event of a deadlock between Plaintiff and the SB Developer.  Crumley did not have authority to act without the prior approval of both Plaintiff and the SB Developer.

128.    Under Section 1.8 of the LM Operating Agreements, "no asset of the [LLC] shall be Transferred or encumbered for, or in payment of, any individual obligation of any Member."

129.    In addition, under Section 5.8 of the LM Operating Agreements, the ***unanimous*** consent of Plaintiff and the SB Developer is required to authorize any "Major Decisions," defined to include:

- "any act that would render impossible the carrying on of the normal Business and affairs of the [LLC]";

- "assign rights in the property of the [LLC] other than for [an LLC] purpose";

---

[5] Last Mile I was formed on September 22, 2021, and Last Mile II was formed on December 15, 2021.  On October 15, 2021, the original Operating Agreement for Last Mile I was executed by Plaintiff, the SB Developer, and Crumley (who was the Consent Manager of Last Mile I).  On March 15, 2022, Plaintiff, the SB Developer, and Crumley executed an Amended Operating Agreement for Last Mile I, and Plaintiff and the SB Developer executed an initial Operating Agreement for Last Mile II.  As noted, the operative terms of these Operating Agreements are substantially the same.

- "permit the creation of any … encumbrance … over the whole or any part of the undertaking, property or assets of the  [LLC]";

- "Enter into any agreement, contract or other instrument (i) which would cause any Member or its Affiliates to become personally liable on or in respect of, or to guarantee any, indebtedness of the [Last Mile I or Last Mile II] or any of their respective Subsidiaries or Affiliates, or (ii) that is not non-recourse to such Member or its Affiliates."

130.    Furthermore, under Section 5.1, each Manager is required to perform its duties "in good faith," and is subject to personal liability for any act not taken in good faith and with a reasonable belief that such act was in the best interests of the LLC.  Moreover, under this Section, Managers are liable for conduct that constitutes an "intentional or willful and wanton violation of the implied covenant of good faith and fair dealing," for criminal activity, and for fraud.

131.    Before August 2021, when Plaintiff made its $30 million investment in the Dot Ave Project, the SB Developer had obtained millions of loans from individual investors comprised largely of family and friends of the SB Developer (hereinafter the "Legacy Investors").

132.    As a condition of the refinancing, Cottonwood and EMI required standstill agreements with all Legacy Investors pursuant to which the Legacy Investors would not take any action to recover on their loans for a minimum of 24 months from the refinancing closing date (March 23, 2022).

133.    During the seven-month period leading up to the closing, Crumley negotiated new equity agreements with the Legacy Investors (hereinafter "Equity Agreements") pursuant to

which the Legacy Investor's prior loans were converted to preferred equity senior to the equity

position of the Last Mile LLCs.  Crumley did not disclose or obtain Plaintiff's consent for the

terms of the Equity Agreements.

134.    In addition, unknown to Plaintiff, in connection with the Equity Agreements,

Crumley and the SB Developer had – without Plaintiff's knowledge or consent, and in violation

of the LM Operating Agreements – executed personal guarantees exceeding $82 million

(hereinafter the "Personal Guarantees"), pursuant to which Crumley and/or the SB Developer

personally guaranteed repayment of the Legacy Investors.

135.    Defendants, which pursuant to the Consulting Agreement were to advise Plaintiff

concerning the Dot Ave Project, did not disclose the existence of the Personal Guarantees to

Plaintiff, or to Cottonwood and EMI.  Certain Personal Guarantees went as far as to require

repayment of the Legacy Investors within as little time as 30 days from the refinancing closing

date, in violation of the closing conditions established by Cottonwood and EMI.

136.    Neither Crumley nor the SB Developer ever had the ability to repay the Personal

Guarantees.

137.    On June 27, 2022, Defendants first disclosed to Plaintiff that Crumley had, with

the SB Developer, entered into Personal Guarantees which were in breach and were threatening

the Project.  In an email sent to Adam Crowson on that date, Crumley stated "we should have a

pow wow on how to deal with the legacy investors," which Crumley alleged "are really turning

up the pressure for progress."  In the email, Crumley first disclosed to Plaintiff that "There has

already been 1 lawsuit filed against [the SB Developer] and me" by one Legacy Investor

claiming $2.5 million, and that other Legacy Investors had issued demand letters and levied "a

number of threats" against Crumley and the SB Developer.

138.    Plaintiff responded immediately to the Crumley's disclosure of this information. Approximately 30 minutes after receiving Crumley's June 27, 2022 email, Adam Crowson sent a reply in which he demanded that Crumley provide Plaintiff with a listing of the Legacy Investors to whom commitments had been made outside of the agreements executed at the March 23, 2022 closing, and the specific terms of each such commitment. Crowson noted that Crumley's email "is providing us with information we did not know."

139.    The following day, June 28, 2022, Crumley emailed Crowson a spreadsheet that disclosed to Plaintiff, for the first time, not only that the SB Developer and Crumley had entered into Personal Guarantees and other commitments with 12 Legacy Investors, but also that ***those agreements had been secured by the Last Mile Property***. Crumley's spreadsheet also disclosed to Plaintiff, for the first time, that millions of dollars in payments owed to the Legacy Investors were then overdue, that one Legacy Investor had already filed a lawsuit, and that many other Legacy Investors were demanding immediate repayment.

140.    Once again, Plaintiff responded immediately to Crumley's disclosure, and in an email reply sent later on June 28, 2022, Adam Crowson directed Crumley to disclose "any additional documentation/agreements that were provided/executed by each legacy."

141.    Crumley responded, later on June 28, 2022, by providing Plaintiff with copies of eleven Personal Guarantees entered into with Legacy Investors between March 7, 2022 and March 25, 2022.

142.    Following its discovery of Crumley's misconduct, Plaintiff removed him from his position as Consent Manager for Last Mile I.

143.    Ultimately, between May 2022 and November 2022, at least six Legacy Investors filed suit against Crumley and/or the SB Developer, asserting claims in excess of $60 million.

144.    By the end of the year 2022, Plaintiff's total investment in the Dot Ave Project was over $37 million, representing the $30 million initial investment and subsequent payments Plaintiff was required to make in response to capital calls and to cover Project costs.

145.    Defendant's misconduct with respect to the concealment, by Crumley, of the unauthorized Personal Guarantees with Legacy Investors had a devastating effect on the Dot Ave Project.

146.    Litigation brought and threatened by the Legacy Investors significantly impaired the Last Mile LLCs' efforts to obtain additional financing necessary for the Dot Ave Project.

147.    In March 2023, the Cottonwood and EMI loans matured without payment, and without new financing in place.

148.    Ultimately, in July 2023, EMI purchased the Cottonwood loan, and thereafter owned both the senior and mezzanine loans on the Dot Ave Project.

149.    Starting in August 2023, the Last Mile LLCs and EMI entered into forbearance agreements to afford the Last Mile LLCs additional time to obtain new financing.  Those efforts failed.

150.    In October 2024, EMI foreclosed on its loans, took ownership of and control over the Dot Ave Project, and eliminated Plaintiff's investment of at least $37 million.

151.    To date, Plaintiff has lost more than $37 million on the Dot Ave Project.

## CAUSES OF ACTION

### COUNT I
**Breach of Fiduciary Duty**
***(Against Crumley, Sahadeo, Williams)***

152.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

153.    Oaks Village was at all relevant times a manager-managed LLC organized under the laws of the State of Washington.  At all relevant times, Crumley, Sahadeo, and Williams were Oaks Village's Managers.

154.    As Managers of Oaks Village, Crumley, Sahadeo, and Williams each owed a fiduciary duty of care to the Members of Oaks Village, including Plaintiff. This duty required, among other things, that Crumley, Sahadeo, and Williams to refrain from intentional misconduct or violations of laws.  Pursuant to the law of the State of Washington, such duties may not be eliminated pursuant to an LLC agreement. Wash. Rev. Code § 25.15.038(6)-(7).

155.    As the Managers of Oaks Village, Crumley, Sahadeo, and Williams breached their fiduciary duties to Plaintiff by engaging in the misconduct and violations of law described herein.

156.    Plaintiff has been damaged as a result of the breaches of fiduciary duties described herein in the amount of at least $3.925 million plus interest, the amount of Plaintiff's money transferred into the Oaks Chase Account as a result of Defendants' fraud and which Defendants intentionally failed to use for the benefit of Oaks Village.

## COUNT II
### Negligence
### *(Against Crumley, Sahadeo, Williams)*

157.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

158.    As the Managers of Oaks Village, Defendants Crumley, Sahadeo, and Williams owed duties to the Members of Oaks Village, including Plaintiff. These duties include, without limitation, the duty of care.

159.    Crumley, Sahadeo, and Williams breached the duties they owed Plaintiff by failing to exercise reasonable care in their management of Oaks Village.

160.    Defendants' negligence caused harm to Plaintiff in the amount of at least $3.925 million plus interest.

**COUNT III**
**Conversion**
***(Against All Defendants)***

161.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

162.    In July 2023, Plaintiff transferred $3.925 million of its money to the Oaks Chase Account.  The Oaks Chase Account belonged to Oaks Village, an LLC in which Plaintiff held a membership interest, and the funds Plaintiff transferred to the Account were to be used solely for the Oak Harbor Project being undertaken by Oaks Village.

163.    Defendants, who exercised complete control over the Oaks Chase Account, improperly misdirected Plaintiff's money by transferring the funds into other accounts they controlled, and by using the funds for their own personal benefit and, upon information and belief, for purposes unrelated to Oak Harbor Project.  Defendants' improper transfers from the Oaks Chase Account include:

- $3,491,922 transferred to an account belonging, upon information and belief, to Sahadeo, through 61 separate transactions over a period of just six months;

- $90,000 transferred to the Crumley Chase Account;

- $15,000 transferred to a Boston law firm, Rubin & Rudman, that upon information and belief represented Crumley in litigation brought in the unrelated Dot Ave Project;

- $100 transferred to a CEP account.

164.    Defendants have not accounted for their disbursement of funds from the Oak Chase Account, including the $3.925 million that Plaintiff transferred to the Account.

165.    As a result of self-dealing, Defendants exercised unauthorized possession and control over of Plaintiff's funds, and intentionally and wrongfully exercised acts of ownership and control over the funds, which they had no right to. Plaintiff has never been repaid any of its $3.925 million.

166.    Plaintiff has been damaged in the amount of at least $3.925 million plus interest as a result of Defendants' conversion of Plaintiff's property.

**COUNT IV**
**Fraudulent Inducement: Oak Harbor Project**
***(Against All Defendants)***

167.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

168.    Defendants fraudulently induced Plaintiff to invest $3.925 million into the Oak Harbor Project by making intentional misrepresentations of material fact to Plaintiff, and by failing to disclose material facts when Defendants had a duty to do so, regarding Project.  For example:

(a)     Defendants misrepresented that the Project was a safe, sure investment as a result of commitments purportedly reached with the Project developer, Ludwigsen, and institutional lender, Setanta;

(b)     Defendants withheld information that Ludwigsen had been charged with rape and pled guilty to the charge immediately before Plaintiff's investment;

(c)    Defendants misrepresented, and concealed information concerning, Setanta's commitment to provide at least $12 million to fund the Oak Harbor Project, and concerning Defendants' commitment to obtain funding from Setanta;

(d)    Defendants misrepresented that as soon as Plaintiff invested $3.925 million, Setanta would provide at least $12 million in funding for the Oak Harbor Project;

(e)    Defendants misrepresented, and concealed information concerning, Defendants' intended use of Plaintiff's $3.925 million investment;

(f)    Defendant misrepresented that they would use Plaintiff's $3.925 million to pay for a portion of development costs related to the Project;

(g)    Defendants concealed that they intended to use Plaintiff's money to pay for the majority of the costs of purchasing the Oak Harbor Property.

169.    Defendants misrepresented, and concealed, these and other facts to induce Plaintiff to invest $3.925 million in the Oak Harbor Project.

170.    Defendants made such misrepresentations knowing that they were false, and they failed to disclose material facts to Plaintiff knowing that Plaintiff was unaware of the facts and did not have an equal opportunity to discover the facts.

171.    Defendants intended Plaintiff to rely on Defendants' misrepresentations and nondisclosures.

172.    Plaintiff justifiably relied on Defendants' misrepresentations and nondisclosures in deciding to invest $3.925 million in the Oak Harbor Project.

173.    As a result of Defendants' misrepresentations and nondisclosures, Plaintiff has been damaged in the amount of at least $3.925 million.

## COUNT V
### Fraudulent Misrepresentation: Oak Harbor Project
#### *(All Defendants)*

174.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

175.    After Plaintiff invested $3.925 million in the Oak Harbor Project, Defendants made knowing misrepresentations of material fact to Plaintiff, and failed to disclose material facts to Plaintiff when Defendants had a duty to do so, regarding the Project.  For example:

(a)     Defendants knowingly misrepresented, and knowingly withheld information concerning, the status of the Project;

(b)     Defendants knowingly misrepresented, and knowingly withheld information concerning, Setanta's willingness to fund the Project if Ludwigsen was not involved in the Project;

(c)     Defendants knowingly misrepresented, and knowingly withheld information concerning, Defendants' efforts to obtain alternative lenders for the Project;

(d)     Defendants knowingly withheld information concerning their expenditure of funds from the Oaks Chase Account;

(e)     Defendants knowingly misrepresented, and knowingly withheld information concerning, D.R. Horton's continued involvement in the Project;

(f)     Defendants knowingly withheld information that D.R. Horton has terminated the PSA with Oaks Village;

(g)     Defendants knowingly misrepresented, and knowingly withheld information concerning, the WADOT loan;

(h)     Defendants knowingly withheld information concerning their failure to make payments under the WADOT loan, and WADOT's initiation of foreclosure proceedings.

176.    Defendants knowingly misrepresented, and knowingly withheld, these and other facts in order to conceal their prior misrepresentations and concealments; to induce Plaintiff to agree to the expenditure of funds (including the $375,000 buyout of Ludwigsen); to induce Plaintiff to agree to Defendants' acceptance of D.R. Horton's earnest money deposit of $2.025 million; and to refrain from taking actions to protect its investment and prevent Defendants from further expending Plaintiff's investment.

177.    Defendants made such misrepresentations knowing that they were false, and Defendants failed to disclose material facts to Plaintiff knowing that Plaintiff was unaware of the facts and did not have an equal opportunity to discover such facts.

178.    Defendants intended Plaintiff to rely on Defendants' misrepresentations and nondisclosures.

179.    Plaintiff justifiably relied on Defendants' misrepresentations and nondisclosures in not taking action to prevent Defendants' expenditure of funds (including the $375,000 buyout of Ludwigsen); in not taking action to prevent Defendants from accepting D.R. Horton's earnest money deposit of $2.025 million; and in refraining to take actions to protect its investment and prevent Defendants from further expending Plaintiff's investment.

180.    As a result of Defendants' knowing misrepresentations and nondisclosures, Plaintiff has been damages in the amount of at least $3.925 million.

## <u>COUNT VI</u>
## Negligent Misrepresentation: Oak Harbor Project
### (*Against All Defendants*)

181.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

182.    To induce Plaintiff to invest $3.925 million into the Oak Harbor Project, Defendants made false misrepresentations of material fact to Plaintiff, and failed to disclose material facts, concerning the Project.  For example:

(a)    Defendants misrepresented that the Project was a safe, sure investment as a result of commitments purportedly reached with the Project developer, Ludwigsen, and institutional lender, Setanta;

(b)    Defendants withheld information that Ludwigsen had been charged with rape and pled guilty to the charge immediately before Plaintiff's investment;

(c)    Defendants misrepresented, and withheld information concerning, Setanta's commitment to provide at least $12 million to fund the Oak Harbor Project, and concerning Defendants' commitment to obtain funding from Setanta;

(d)    Defendants misrepresented that as soon as Plaintiff invested $3.925 million, Setanta would provide at least $12 million in funding for the Oak Harbor Project;

(e)    Defendants misrepresented, and withheld information concerning, the use of Plaintiff's $3.925 million investment;

(f)    Defendant misrepresented that Plaintiff's $3.925 million would be used to pay for a portion of development costs related to the Project;

(g)    Defendants withheld information that Plaintiff's $3.925 million would be used to pay for the majority of the costs of purchasing the Oak Harbor Property.

183.    Defendants failed to exercise reasonable care when it made these misrepresentations to Plaintiff, and failed to disclose material information to Plaintiff.

184.    Plaintiff justifiably relied on Defendants' misrepresentations and nondisclosures in deciding to invest $3.925 million in the Oak Harbor Project.

185.    As a result of Defendants' negligent misrepresentations and nondisclosures, Plaintiff has been damaged in the amount of at least $3.925 million.

### COUNT VII
### Fraudulent Inducement: Dot Ave Project
### *(Against All Defendants)*

186.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

187.    Defendants fraudulently induced Plaintiff to invest $30 million in the Dot Ave Project through the acquisition of membership interests in the Last Mile LLCs.  Defendants had, through CEP, entered into a Consulting Agreement pursuant to which CEP assumed an obligation to advise Plaintiff with respect to the Project and Plaintiff's investment in the same.

188.    Defendants concealed from Plaintiff that prior to the March 23, 2022 closing on refinancing for the Dot Ave Project, and the concurrent conversion of Plaintiff's secured $30 million investment into membership interests in the Last Mile LLCs, Crumley and the SB Developer had – in violation of the LM Operating Agreements – entered into Personal Guarantees with Legacy Investors which were secured by the Last Mile Property and called for repayment within as little time as 30 days from the closing.

189.    Defendants concealed the Personal Guarantees with Legacy Investors to induce Plaintiff to proceed with the conversion of its $30 million investment in the Dot Ave Project to

membership interests in the Last Mile LLCs, and also to induce Plaintiff to pay additional amounts totaling approximately $7 million in response to capital calls, and to cover Project costs.

190.    Defendants knew that Plaintiff was unaware of the Personal Guarantees and did not have an equal opportunity to discovery the existence of the same.

191.    Defendants had a duty to disclose the existence of the Personal Guarantees to Plaintiffs.

192.    Defendants intended Plaintiff to rely on the nondisclosure of the Personal Guarantees.

193.    Plaintiff justifiably relied on the nondisclosure of the Personal Guarantees in agreeing to the conversion of its secured $30 million investment into member interests in the Last Mile LLCs.

194.    Plaintiff also justifiably relied on the nondisclosure of the Personal Guarantees in agreeing to make additional payments totaling approximately $7 million to cover capital calls and pay for Project costs.

195.    As a result of Defendants' knowing nondisclosures, Plaintiff has been damaged in the amount of at least $37 million.

<u>**COUNT VIII**</u>
**Violation of Chapter 93A**
*(Against All Defendants)*

196.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

197.    Massachusetts General Laws Chapter 93A, § 11 authorizes actions for equitable relief and damages built upon unfair and deceptive acts or practices that may have the effect of causing loss of money or property.

42

198.    Defendants are "person[s]" that engage in "trade or commerce" within the meaning of Chapter 93A § 11, and Plaintiff is in a commercial relationship with Defendants.

199.    Conduct that is immoral, unethical, oppressive, or unscrupulous constitutes an unfair act or practice for purposes of G.L. c. 93A, § 11. Conduct that is fraudulent or deceptive also constitutes a violation of G.L. c. 93A, § 11.

200.    Through conduct more particularly described above, Defendants committed unfair and deceptive acts and practices in the conduct of trade or commerce in violation of Chapter 93A.

201.    The unfair or deceptive acts and practices described above occurred primarily and substantially in the Commonwealth of Massachusetts.

202.    The unfair or deceptive acts and practices of Defendants were done intentionally and knowingly.

203.    The unfair and deceptive practices described above caused to Defendants to lose money or property in an amount exceeding $43 million, plus prejudgment interest and attorneys' fees.

204.    Because Defendants' conduct was knowing and willful, Plaintiff is entitled to no less than double and up to treble damages.

## COUNT IX
### Negligent Misrepresentation: Oak Harbor Project
### *(Against All Defendants)*

205.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

43

206.    To induce Plaintiff to invest $3.925 million into the Oak Harbor Project, Defendants made false misrepresentations of material fact to Plaintiff, and failed to disclose material facts, concerning the Project.  For example:

(a)    Defendants misrepresented that the Project was a safe, sure investment as a result of commitments purportedly reached with the Project developer, Ludwigsen, and institutional lender, Setanta;

(b)    Defendants withheld information that Ludwigsen had been charged with rape and pled guilty to the charge immediately before Plaintiff's investment;

(c)    Defendants misrepresented, and withheld information concerning, Setanta's commitment to provide at least $12 million to fund the Oak Harbor Project, and concerning Defendants' commitment to obtain funding from Setanta;

(d)    Defendants misrepresented that as soon as Plaintiff invested $3.925 million, Setanta would provide at least $12 million in funding for the Oak Harbor Project;

(e)    Defendants misrepresented, and withheld information concerning, the use of Plaintiff's $3.925 million investment;

(f)    Defendant misrepresented that Plaintiff's $3.925 million would be used to pay for a portion of development costs related to the Project;

(g)    Defendants withheld information that Plaintiff's $3.925 million would be used to pay for the majority of the costs of purchasing the Oak Harbor Property.

207.    Defendants failed to exercise reasonable care when it made these misrepresentations to Plaintiff, and failed to disclose material information to Plaintiff.

208.    Plaintiff justifiably relied on Defendants' misrepresentations and nondisclosures in deciding to invest $3.925 million in the Oak Harbor Project.

209.     As a result of Defendants' negligent misrepresentations and nondisclosures, Plaintiff has been damaged in the amount of at least $3.925 million.

### COUNT X
**Unjust Enrichment**
*(Against All Defendants)*

210.     Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

211.     Plaintiff paid $3.925 million to invest in the Oak Harbor Project, which money Defendants knowingly benefited from.

212.     Based on the circumstances described herein, including Defendants fraud, false statements, and omissions made to induce Plaintiff's reliance, it would be manifestly unjust and inequitable for Defendants to retain the money paid by Plaintiff in relation to the Oak Harbor Project. As such, Defendants must return to Plaintiff at least $3.925 million plus interest.

### COUNT XI
**Civil Conspiracy**
*(Against All Defendants)*

213.     Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

214.     Each of the Individual Defendants, acting in concert through their entity CEP, combined to defraud Plaintiff of millions of dollars as described herein. Indeed, on information and belief, Defendants agreed to pursue the scheme described herein to defraud Plaintiff and enrich themselves.

215.     As a group, Defendants possessed a unique power of coercion over Plaintiff because they were able to present themselves as experienced and well-connected in a range of fields and markets across the United States – from real estate to financial services to construction

management – and to show themselves as being closely involved in each of the projects in which they sought investment.

216.    Defendants are liable to Plaintiff for damages exceeding $43 million which Plaintiff incurred a result of Defendants' conspiracy.

## COUNT XII
### Breach of Fiduciary Duty (Long Mile I)
### *(Against Crumley)*

217.    Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

218.    Crumley was a member of the Last Mile I Board of Managers and the LLC's appointed Consent Manager, with the right to break ties between Plaintiff and the SB Developer in the course of management decision-making.

219.    As the Last Mile I Consent Manager and Board Member, Crumley owed fiduciary duties of care and loyalty to Last Mile I Members, including Plaintiff. These duties required, among other things, for Crumley to refrain from self-dealing, to act in an informed and reasonable manner, and to act in good faith in furtherance of the best interests of the LLC.

220.    Crumley breached these fiduciary duties to Plaintiff by, among other things, approving Equity Agreements with Legacy Investors without informing Plaintiff of the Agreements' terms; and joining with the SB Developer in entering into Personal Guarantees with Legacy Investors without Plaintiff's knowledge or consent, thereby exposing Dot Ave Project to litigation risk and preventing the Last Mile LLCs from obtaining funding needed to complete the Project.

221.    Clumley is liable to Plaintiff for damages exceeding $37 million which Plaintiff incurred as a result of Crumley's breaches of fiduciary duties.

## COUNT XIII
### Negligence
### *(Against Crumley)*

222.     Plaintiff re-alleges and incorporates herein the allegations of the preceding paragraphs of this Complaint as if fully set forth herein.

223.     Crumley was a member of the Last Mile I Board of Managers and the LLC's appointed Consent Manager, with the right to break ties between Plaintiff and the SB Developer in the course of management decision-making.

224.     As the Last Mile I Consent Manager and Board Member, Crumley owed fiduciary duties of care and loyalty to Last Mile I Members, including Plaintiff. These duties required, among other things, for Crumley to refrain from self-dealing, to act in an informed and reasonable manner, and to act in good faith in furtherance of the best interests of the LLC.

225.     Crumley breached his fiduciary duties to Plaintiff by, among other actions, failing to exercise reasonable care in relation to approving Equity Agreements with Legacy Investors; and failing to disclose and obtain Plaintiff's authorization for Personal Guarantees with Legacy Investors.

226.     Plaintiff has been damaged as a result of Defendants' negligence in an amount that remains under investigation and will be proven at trial, and which exceeds $38.5 million.

## PRAYERS FOR RELIEF

Wherefore, Plaintiff requests that this Court enter judgment in its favor and grant the following relief:

(a)     General and special compensatory damages in an amount according to proof at trial including, without limitation, $3.925 million plus interest as expended by Plaintiff on the

Oak Harbor Project; and at least $37 million plus interest as expended by Plaintiff on the Dot

Ave Project.

       (b)     Double or treble damages and attorneys' fees in accordance with M.G.L. ch. 93A

§ 11.

       (c)     Injunctive relief including, *inter alia*, an order preventing Crumley and Williams

from secreting, concealing, destroying, damaging, selling, transferring, pledging, encumbering,

assigning, or in any way or manner disposing of, reducing, or impairing the value of the assets of

CJRI, including their membership units in CJRI, and any of their interest in Bluefin or Greenfin;

       (d)     Attorneys' fees and costs of suit incurred herein as authorized by law and/or

contract.

       (e)     Such other relief as this Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a jury trial on all claims so triable.

Respectfully Submitted,

EASTON MARK INC.

*/s/ Christopher H.M. Carter*
Mitchell R. Edwards (BBO # 647600)
Christopher H.M. Carter (BBO # 561146)
Daniel D. Johnson (BBO # 705486)
HINCKLEY ALLEN & SNYDER LLP
28 State Street
Boston, MA  02109
Telephone:  (617) 345-9000
Facsimile:  (617) 345-9020
medwards@hinckleyallen.com
ccarter@hinckleyallen.com
djohnson@hinckleyallen.com

Dated:  June 3, 2025

#66284635