## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
_____
                                   )
EASTON MARK INC.,                  )
                                   )
                  Plaintiff,       )
                                   )
v.                                 )
                                   )         Civil Action
JORDAN CRUMLEY, CHRISTOPHER        )         No. 25-cv-11614-PBS
WILLIAMS, RAYMOND SAHADEO, NATE    )
WALSH, and CHESTNUT EQUITY         )
PARTNERS RE, LLC,                  )
                                   )
                  Defendants.      )
_____)
```

## MEMORANDUM AND ORDER

January 28, 2026

Saris, J.

## INTRODUCTION

This lawsuit arises from two unsuccessful real estate development projects in Washington and Massachusetts. In 2021, Defendant Chestnut Equity Partners RE, LLC ("CEP") solicited Plaintiff Easton Mark Inc. ("Easton Mark") to invest in the two projects. Easton Mark ultimately invested a total of about $3.925 million and $37 million in the Washington and Massachusetts projects, respectively. Neither project made it past the initial stages, and Easton Mark lost its investments. Easton Mark subsequently filed this lawsuit for damages alleging, among other things, that CEP and its managers -- Defendants Jordan Crumley, Christopher Williams, Raymond Sahadeo, and Nate Walsh

1

(collectively with CEP, "Defendants") -- fraudulently induced Easton Mark to invest in the projects, breached their fiduciary duties in connection with their management of the projects, and misappropriated funds from the Washington project.

Easton Mark moves for a preliminary injunction seeking to prevent Defendants from transferring or encumbering their assets during the pendency of this lawsuit. After hearing, the Court **DENIES** Easton Mark's motion for preliminary injunction (Dkt. 8).

**BACKGROUND**

The Court draws the following background from the affidavits and exhibits submitted by the parties. Many of the relevant facts are hotly disputed.

## I.   **Initial Dealings Between the Parties**

Easton Mark is the real estate investment arm of a family office based in Nevada. Adam Crowson is Easton Mark's vice president.

CEP was a Massachusetts limited liability company established to own and develop real estate. Crumley, Sahadeo, Williams, and Walsh were CEP's founders and managers. CEP was involuntarily dissolved in December 2023.

Crowson met Crumley in 2020, and the two began discussing opportunities for Easton Mark to invest in CEP's real estate projects. That year, Easton Mark made one-year investments or loans

for two relatively small CEP projects. CEP paid Easton Mark what it was owed for those two projects.

In February 2021, Easton Mark loaned $600,000 to Crumley and Williams for a residential project in Rhode Island. Crumley and Williams pledged a 40% membership interest in CJ RI Apartments, LLC ("CJRI") as collateral for the loan. Crumley and Williams defaulted on their repayment obligations when the loan matured in February 2024. Easton Mark foreclosed on the collateral in the spring of 2025 and purchased the 40% membership interest in CJRI via a credit bid.

## II.  __Oak Harbor Project__

In March 2021, CEP learned about an opportunity to invest in a residential development project in Oak Harbor, Washington (the "Oak Harbor Project"). The project involved the development of two plots of land into 135 lots ready for residential homebuilding. Crumley told Crowson about the project, and CEP began to investigate the opportunity.

Crowson and others at Easton Mark discussed the Oak Harbor Project with Crumley, Sahadeo, and Williams numerous times over the following months. Sahadeo and Williams told Easton Mark that Darren Ludwigsen, the project's developer, and D.R. Horton, one of the country's largest homebuilders, had signed a letter of intent for D.R. Horton to purchase the developed property for over $20 million and that the two parties had completed similar deals

3

before. For these reasons, Sahadeo and Crumley expressed that the
Oak Harbor Project was "no-risk." Dkt. 13 ¶ 24. Sahadeo also stated
that he and Ludwigsen had a strong personal relationship and that
CEP had done due diligence on Ludwigsen. Finally, Crumley, Sahadeo,
and Williams explained that Ludwigsen had an institutional lender,
Setanta Development Capital ("Setanta"), lined up to finance the
acquisition of the property and most construction costs and that
Ludwigsen needed $3.925 million in additional funding for
construction expenses in order to obtain the Setanta loan. Easton
Mark agreed to provide this extra capital.

The participants in the Oak Harbor Project executed a series
of agreements in May and June 2021. On May 6, D.R. Horton signed
a purchase and sale agreement (the "PSA") committing to making an
earnest money deposit of $2.025 million after conducting due
diligence and then purchasing the completed project for $20.925
million. On June 9, Oaks Village 135 LLC ("Oaks Village"), the
entity formed to purchase the property, executed a term sheet with
Setanta for a $12 million loan. Crumley emailed Crowson this term
sheet the next day, explaining that CEP was seeking a bigger loan.
Crumley told Crowson that the Setanta loan would close when the
increase was approved. And on June 23, CEP and Easton Mark executed
an operating agreement for Oaks Village, which gave all the common
membership units to CEP and all the preferred membership units to
Easton Mark. Crumley, Sahadeo, and Williams were named the managers

4

of Oaks Village. Section 6.4 of the operating agreement provided that "[e]xcept as otherwise required by law, no Manager shall have any fiduciary duty to the Company, any Member or any other Person, and no Manager shall have any liability to the Company, any Member or any other Person based on any claim of a breach of fiduciary duty." Dkt. 13-9 at 18.

As these events were unfolding, Easton Mark completed its investment in the Oak Harbor Project. On July 9, 2021, Crumley forwarded to Crowson an amended term sheet from Setanta and told him they were "good to go w[ith] Oaks over email." Dkt. 13-15 at 2. The same day, Easton Mark initiated a wire transfer of $3.925 million to Oaks Village's bank account in exchange for membership units in Oaks Village. The wire transfer cleared on July 13.

While the Oak Harbor Project deal was coming together, Ludwigsen, the developer, was facing serious personal legal issues. A few years earlier, Ludwigsen had been charged with rape. On July 8, 2021 -- a day before Easton Mark transferred funds for the Oak Harbor Project -- Ludwigsen pleaded guilty to the criminal charge. He was later sentenced to six months of incarceration.

The parties dispute what CEP knew about Ludwigsen's criminal charge and when CEP told Easton Mark. According to Defendants, Sahadeo learned on June 22, 2021, that Ludwigsen was facing a criminal rape charge. Sahadeo texted Crowson that day that he had "some bad news regarding Intel on Darren [Ludwigsen]." Dkt. 36-1

at 25. In a follow-up call, Sahadeo relayed to Crowson Ludwigsen's explanation that a woman had accused him of rape, the accusation was made up, and he expected the charge to be dismissed. Based on this explanation, Sahadeo did not believe Ludwigsen was facing jail time. Sahadeo claims he only learned of the seriousness of the charge against Ludwigsen in mid-July 2021.

Easton Mark has a different account. According to Crowson, he first heard about Ludwigsen's legal problems on July 9 -- the day Easton Mark initiated the transfer for the Oak Harbor Project -- when Crumley texted Crowson the following: "I just got a text bomb conversation from [Ludwigsen] and [Sahadeo] that [Sahadeo] forwarded. I'll send it tomorrow, but it's all good stuff." Dkt. 13-18 at 2. The next day, Crumley sent Crowson a set of text messages between Ludwigsen and Sahadeo in which Ludwigsen said he "ha[d] a personal update." Id. On a Zoom call that day, Crumley, Williams, and Sahadeo told Crowson that Ludwigsen was facing "he said/she said" sexual assault allegations and that the charge would not affect the Oak Harbor Project. Dkt. 13 ¶ 45.

Meanwhile, with Easton Mark's investment secured, CEP pursued the closing of the property for the Oak Harbor Project. As part of this effort, CEP sought funding sources beyond the Setanta loan. Ludwigsen's company had received conditional approval for a $2.6 million loan from WADOT Capital, Inc. ("WADOT") on July 9, 2021, and Oaks Village applied for this loan on July 19. According to

Sahadeo, CEP believed Setanta would fund the project but pursued other loan options in light of the project's short timeline. Crumley and Sahadeo expressed to Crowson on multiple occasions during this period that they were planning to close on the Setanta loan in short order. Ultimately, Oaks Village closed on the property on July 23 for approximately $5.2 million, which included $2.55 million from the WADOT loan and funds invested by Easton Mark. Easton Mark did not know at the time that CEP had been negotiating with lenders besides Setanta or that CEP used proceeds from a loan from WADOT to close on the property. The parties dispute whether Easton Mark knew that CEP would use the funds Easton Mark invested to purchase the property.

After closing on the property, CEP continued to pursue both the Setanta loan and other funding sources. Sahadeo told Crowson on July 30 that CEP was considering backup funding sources to Setanta but did not say that CEP had already closed on the WADOT loan. A few days later, Sahadeo emailed Crowson that CEP was "teiing [sic] up WADOt [sic] Capital to use in place of Setanta as they are cheaper, local, and faster (term sheet expected today and closing in a week or two.)." Dkt. 13-21 at 2. And in August 2021, Oaks Village both paid Ludwigsen a $375,000 fee to buy him out of the project and received D.R. Horton's $2.025 million deposit. Sahadeo and Williams told Crowson that the buyout for Ludwigsen was necessary because Setanta would only consider loaning to the

project if Ludwigsen was not involved. The Setanta loan never came to fruition, but the record contains no clear evidence as to why Setanta did not extend a loan to Oaks Village and when Defendants knew Oaks Village would not receive the Setanta loan.

The parties fiercely dispute what occurred when Oaks Village began the execution phase of the Oak Harbor Project. Between July 1 and December 31, 2021, almost $3.5 million was transferred from the Oaks Village bank account to a CEP bank account. A separate $90,000 was transferred to an account controlled by Crumley, although $85,000 was later returned to the Oaks Village account. And $15,000 was transferred to a Boston law firm on October 28, 2022. Easton Mark claims that the work that was ultimately performed on the project did not reflect the expenditure of that much money and, thus, that Defendants must have misappropriated the funds.

For their part, Defendants assert that they transferred funds for the Oak Harbor Project to a CEP bank account because CEP was the construction manager for the project. They account for the land acquisition price, development expenses, and other project-related costs on which they spent the almost $8.9 million invested in the project. See Dkt. 64-3 at 2. Defendants concede that the $15,000 transferred to the Boston law firm was not related to the Oak Harbor Project but provide documentation showing that they transferred this amount from a CEP bank account to the Oaks Village

account before the payment was made. Defendants also claim that although they diligently pursued the project for over a year -- including by submitting multiple sets of plans to the city between December 2021 and September 2022 -- they faced obstacles such as an understaffed engineer, interest rate increases, rising construction costs due to inflation, and changing regulations.

Oaks Village did not secure all approvals and permits by the PSA's deadlines and by the maturity date of the WADOT loan. On August 1, 2022, Oaks Village defaulted on the WADOT loan; a foreclosure sale was later scheduled for April 2023. And on September 16, 2022, D.R. Horton sent Ludwigsen a notice that it was terminating the PSA due to Oaks Village's failure to complete the project. Sahadeo claims that he never received this notice and that Mark Shark, CEP's contact at D.R. Horton, told him that Oaks Village may receive a termination notice as a negotiating tactic, not in order to actually terminate the PSA. On September 23, Sahadeo emailed Crowson that the project was "on a brief construction hold . . . while waiting on some updated engineering from D.R. Horton to submit to the City." Dkt. 13-24 at 2. Sahadeo also explained that D.R. Horton was pulling back from certain projects and that it may offer to buy out the existing investors in the Oak Harbor Project, attempt to renegotiate the PSA, or terminate the deal. Sahadeo emailed Crowson again in January 2023, reiterating that D.R. Horton was still trying to figure out how to

proceed with the project and explaining that Shark had suggested that Oaks Village purchase the WADOT note to increase its leverage for a potential buyout. Sahadeo recommended purchasing the note and reported that he was contacting third parties about raising funds for the purchase. According to Sahadeo, Crowson told him multiple times in early 2023 that Easton Mark would purchase the note.

On March 13, 2023, Sahadeo emailed Crowson that he was "feeling some anxiousness on the position [they were] in and [was] scrambling to come up with options." Dkt. 13-27 at 2. Sahadeo reiterated that he thought Oaks Village should purchase the note and explained that D.R. Horton had a "drop dead date" of April 23, 2023. Id. Sahadeo attached to his email a number of documents relating to the Oak Harbor Project. Among the documents were the conditional approval for the WADOT loan that Ludwigsen received on July 9, 2021, and the settlement statement for the closing of the property on July 23, 2021, which showed that CEP funded the purchase with the WADOT loan. On April 6, 2023, Sahadeo sent Crowson a copy of D.R. Horton's notice of termination from September 2022, which Easton Mark had not previously seen.

In early April 2023, Sahadeo and Williams disclosed to Crowson that the WADOT loan was in default, a foreclosure sale had been scheduled, and Oaks Village owed over $35,000 in property taxes. Sahadeo also told Crowson that the construction budget to complete

the project was about the same as when the project began, the current value of the project was about $10 million, certain preliminary approvals for the project had come through, and the property was "ready for horizontal development." Dkt. 13 ¶ 66. The same day, Williams told Easton Mark that "[t]he final subdivision plat map [was] ready to submit" to the city. Dkt. 13-26 at 2. By the end of the month, however, Easton Mark decided not to purchase the note or put more money into the project.

In May 2023, Easton Mark secured the appointment of a receiver for Oaks Village. The receiver engaged an engineer to assess the status of the project. The engineer identified the "real problem" with the project as "the engineering review," noting that Oaks Village received more than 300 comments from the city on its latest permitting submission, "the constructions plans [were] just not progressing," and "[n]o work ha[d] occurred on-site." Dkt. 43 at 10. The receiver obtained an engineering proposal for certain preliminary work. Although that work began, Easton Mark stopped funding the receivership in September 2023. D.R. Horton purchased the property for almost $3.8 million at a foreclosure auction in March 2024. Easton Mark has received nothing back on its investment in the Oak Harbor Project.

**III. <u>Dot Ave Project</u>**

In July 2021, as Easton Mark was investing in the Oak Harbor Project, Crumley began soliciting Easton Mark to invest in a much

11

larger project to develop a life sciences campus in South Boston, Massachusetts (the "Dot Ave Project"). The developer of the Dot Ave Project (the "SB Developer") was seeking $30 million to extend a distressed loan that had funded the purchase of six parcels of land for the project and to acquire a seventh parcel. The SB Developer planned to later refinance the project, at which point the $30 million loan would convert into an ownership interest.

Easton Mark decided to invest in the Dot Ave Project and, on August 25, 2021, loaned the SB Developer $30 million in exchange for a promissory note secured by a mortgage on the property. The same day, Easton Mark and CEP executed a consulting agreement pursuant to which CEP agreed to advise Easton Mark with respect to the Dot Ave Project. Easton Mark promised to pay CEP half of the interest it collected on its $30 million loan to the SB Developer.

The planned refinancing for the Dot Ave Project, which had a maturity of one year, closed on March 23, 2022. As a condition of the refinancing, the new lenders required that certain legacy investors in the Dot Ave Project (the "Legacy Investors") execute standstill agreements in which they promised not to make efforts to secure repayment of their loans for at least twenty-four months from the refinancing closing date. Nonetheless, between March 7 and March 15, 2022, the SB Developer had executed personal guarantees with various Legacy Investors. Most of these guarantees required the SB Developer to use best efforts to make certain

payments within a period ranging from one week to 180 days, while at least one mandated a payment to a Legacy Investor. Crumley signed at least one of the personal guarantees. On March 25, 2022, the SB Developer executed another agreement promising a payment of $34,600,000 to a Legacy Investor within ninety days. In total, these guarantees exceeded $50 million in payments during 2022.

As planned, upon the closing of the refinancing on March 23, 2022, Easton Mark's $30 million principal converted into membership interests in two limited liability companies ("LLCs") formed to own the Dot Ave Project (the "Last Mile LLCs"). Easton Mark simultaneously released its security interest in the property, and title to the property was transferred to entities related to the Last Mile LLCs. The managers of one of the Last Mile LLCs were Crumley and representatives from both Easton Mark and the SB Developer. At the time the refinancing closed, Easton Mark knew of the Legacy Investors' preexisting claims for repayment, and Crumley had disclosed to Easton Mark the standstill agreements with the Legacy Investors. But Easton Mark did not know that the SB Developer had executed personal guarantees with the Legacy Investors. Over the subsequent months, Easton Mark invested $7 million in capital calls to cover project costs.

Between May 2022 and November 2022, at least six Legacy Investors filed lawsuits against the SB Developer and/or Crumley, seeking a total of more than $60 million. Crumley sent Crowson

information about the Legacy Investors, the personal guarantees, and actual and potential litigation by the Legacy Investors in late June 2022. Easton Mark subsequently removed Crumley as a manager of one of the Last Mile LLCs.

The parties dispute whether the personal guarantees affected the Dot Ave Project. According to Easton Mark, the threatened and actual litigation by the Legacy Investors hampered the Last Mile LLCs' ability to obtain new financing when the existing loans matured in March 2023. Defendants deny that the personal guarantees negatively affected the project, asserting that the Legacy Investors were already seeking repayment before the guarantees, the guarantees had no effect on refinancing the project in March 2023, and the guarantees helped stabilize the project to allow for continued development. Defendants attribute the project's failure to high interest rates, inflation, and preexisting disputes with the Legacy Investors.

In October 2024, a lender conducted a strict foreclosure of the membership interests in entities related to the Last Mile LLCs. Easton Mark lost more than $37 million on the Dot Ave Project.

## LEGAL STANDARD

Federal Rule of Civil Procedure 64(a) specifies that "[a]t the commencement of and throughout an action, every remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure

satisfaction of the potential judgment." Although "federal courts lack equitable jurisdiction under Federal Rule of Civil Procedure 65 to enter preliminary injunctions that prevent the transfer of assets pending the adjudication of a claim for money damages," this principle "does not constrain [a] district court's authority to grant analogous relief under Rule 64 when authorized by the law of the forum state." Pineda v. Skinner Servs., Inc., 22 F.4th 47, 49 (1st Cir. 2021).

Massachusetts law authorizes courts to issue preliminary injunctions to prevent a defendant from "dissipating its assets to avoid payment of any judgment." Id. at 55. A plaintiff seeking such an injunction "must meet a three-part test: (1) that [it] likely is to succeed on the merits, (2) that [it] likely will suffer irreparable harm in the absence of the preliminary relief, and (3) that the risk of irreparable harm outweighs the potential harm to the nonmoving party if the injunction is awarded." Id. at 53. In the context of a preliminary injunction freezing assets to preserve a defendant's ability to pay a judgment, the "possibility that a defendant may not have assets on the day of judgment may not automatically make out a showing of irreparable injury." Id. at 56 (quoting Micro Signal Rsch., Inc. v. Otus, 417 F.3d 28, 31 (1st Cir. 2005)); see Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 162-63 (1st Cir. 2004) (rejecting the argument that a preliminary injunction freezing assets can be justified

15

based solely on a concern that the defendant will lack assets to pay a judgment). But "the story is quite different where there is a strong indication that the defendant may dissipate or conceal assets." Pineda, 22 F.4th at 56 (quoting Micro Signal, 417 F.3d at 31).

## DISCUSSION

In their briefing on Easton Mark's motion for preliminary injunction, the parties wrangle over whether Easton Mark is likely to succeed on the merits of its claims in this lawsuit. With regard to the Oak Harbor Project, Easton Mark argues that it will likely prevail in proving that some or all of the Defendants fraudulently induced it to invest in the project via misrepresentations about financing and Ludwigsen's criminal liability, fraudulently misrepresented the status of the project while it was ongoing, misappropriated assets from the project for unrelated purposes, and breached their fiduciary duties in managing the project. For the Dot Ave Project, Easton Mark contends that it will likely prove that some or all of the Defendants breached their fiduciary duties or fraudulently induced it to convert its secured loan into membership interests in the LLCs that owned the project by failing to disclose the personal guarantees given to the Legacy Investors. Defendants dispute many of the facts underlying these claims and present a number of legal arguments as to why Easton Mark is unlikely to succeed on the merits.

16

The Court need not resolve the many factual and legal disputes between the parties on the merits of Easton Mark's claims. Even assuming that Easton Mark has demonstrated a likelihood of success on the merits, it has not shown the "strong indication that [Defendants] may dissipate or conceal assets" that is necessary to establish irreparable harm for the type of preliminary injunction it seeks. Id. (quoting Micro Signal, 417 F.3d at 31); see Charlesbank Equity, 370 F.3d at 162 (providing that "irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief" freezing assets).

Easton Mark's argument that Defendants may dissipate or conceal assets primarily rests on its assertion that Defendants misappropriated funds from the Oak Harbor Project. Easton Mark points out that Defendants transferred over $3.5 million between July 1 and December 31, 2021, from the Oaks Village bank account to accounts controlled by Defendants and later $15,000 from the Oaks Village account to a Boston law firm for a purpose unrelated to the project. Easton Mark also stresses that 1) Defendants failed to pay over $35,000 in property taxes related to the project and defaulted on the WADOT loan; 2) Sahadeo told Crowson in early April 2023 that the construction budget to complete the project was about the same as when the project began; and 3) an engineer stated in May 2023 that the property reflected no on-site construction work.

17

Based on these facts, Easton Mark contends that Defendants must have misappropriated the money invested into the project.

While Easton Mark's allegation that Defendants misappropriated funds from the Oak Harbor Project is plausible in light of the facts it marshals, Defendants present evidence telling a different story. In his affidavits, Sahadeo accounts for the project-related expenses on which he claims Defendants spent the almost $8.9 million invested into the project and states that Defendants transferred funds for the project to a CEP bank account because CEP acted as the construction manager. Sahadeo also explains that the $15,000 payment to the Boston law firm originally came from a CEP bank account. And he offers his perspective that while Defendants diligently pursued the planning stages of the project for over a year, the project ultimately failed due to an understaffed engineer, interest rate increases, rising construction costs due to inflation, and changing regulations.

The Court finds Defendants' version of events also to be plausible at this stage despite Easton Mark's arguments to the contrary. The fact that Defendants did not pay certain property taxes and defaulted on the WADOT loan does not mean that they did not use the funds invested in the Oak Harbor Project for project-related purposes. Sahadeo's statement in April 2023 that the construction budget to complete the project was about the same as when the project began is consistent with his attribution of the

failure of the project to interest rates increases and inflation. And Defendants assert that the vast majority of the Oak Harbor Project's funding went to non-construction expenses (e.g., purchasing the land, financing costs, the Ludwigsen buyout, engineer and project management costs). Given this explanation, the Court does not discredit Defendants' account simply because an engineer stated in May 2023 that no construction work had occurred onsite.

Given the substantial factual disputes between the parties about Defendants' use of the funds invested in the Oak Harbor Project, the Court cannot find that Easton Mark's evidence on this score is sufficient to show a strong indication that Defendants may dissipate or conceal assets. See Spencer Cos. v. Armonk Indus., Inc., 489 F.2d 704, 707 (1st Cir. 1973) (affirming denial of preliminary injunctive relief in part because the evidence revealed "a major factual dispute"); Sodexo Operations, LLC v. Abbe, 382 F. Supp. 3d 162, 165 (D. Mass. 2019) (explaining that the parties' facially plausible but conflicting factual accounts "caution[ed] against [preliminary] injunctive relief"). Easton Mark pressed its motion for preliminary injunction via affidavits and a paper record rather than seeking an evidentiary hearing. "[W]hen courts are faced with affidavits at odds and must make a credibility determination between them, courts generally do not issue a preliminary injunction . . . ." Rohm & Haas Elec.

Materials, LLC v. Elec. Cirs. Supplies, Inc., 759 F. Supp. 2d 110, 125 n.107 (D. Mass. 2010). Here, the Court lacks a basis for making a credibility determination between the competing factual accounts presented by the parties. See Am. Century Home Fabrics, Inc. v. Ashley Furniture Indus., Inc., 473 F. Supp. 2d 168, 174-76 (D. Mass. 2007) (proceeding to "rule on the preliminary injunction using only affidavits" where no party requested an evidentiary hearing and refusing to issue an injunction given that the affidavits presented conflicting factual accounts requiring "credibility determinations").

Easton Mark separately points to allegations in a verified complaint filed in the Delaware Chancery Court in February 2025 about Crumley's conduct involving an entity called Greenfin Properties, LLC ("Greenfin"). Greenfin holds a portfolio of apartment buildings in Rhode Island and is partly owned by CJRI, which at the time was itself owned by Crumley and Williams. According to the complaint, on November 21, 2024, Crumley, a manager of Greenfin, attempted to transfer over $43,000 to Williams from Greenfin's bank account without the other managers' approval. About two months later, Crumley obtained a $20,000 cashier's check from Greenfin's account, again without the other managers' approval.

These allegations, while concerning, are also insufficient to establish a strong indication that Crumley and Williams may

dissipate or conceal assets in a manner that would prevent Easton Mark from collecting on any judgment. Easton Mark points solely to allegations in a complaint, albeit a verified one, and does not explain how those allegations have fared throughout the course of the Delaware litigation. And while the complaint alleges that Crumley was taking money out of Greenfin for personal purposes, the Court lacks sufficient factual information to assess the merits of that allegation or to evaluate what role, if any, Williams played in Crumley's conduct.[1]

Finally, Easton Mark contends that simply establishing a likelihood of success on any of its fraud claims would suffice to show irreparable harm. The Court is unpersuaded. While a demonstration that a defendant engaged in a "probable fraud" may support a showing that the defendant may dissipate or conceal assets, see Micro Signal, 417 F.3d at 31, courts finding irreparable harm in this context generally rely on some evidence beyond the simple fact of a fraud itself, such as fraudulent transfers, conversion of assets, and misuse of the corporate form, see id. at 31 (relying on the defendant's "probable fraud, his prevarications about repayment, and the switch of the business"

---

[1] During the non-evidentiary hearing on Easton Mark's motion for preliminary injunction, Easton Mark indicated that it had reason to believe that Crumley and Williams were "actively seeking to dispose of their interests in" Greenfin and Bluefin, another entity partially owned by CJRI. Dkt. 79 at 63. Easton Mark never offered evidence on this score.

from one corporate entity to another); Safeguard Props. Mgmt., LLC v. Zoll, No. 22-cv-11004, 2022 WL 16838781, at *12 (D. Mass. Nov. 8, 2022) (relying on both the defendants' fraud and their abuse of the corporate form); BRT Mgmt., LLC v. Malden Storage, LLC, No. 17-cv-10005, 2022 WL 95926, at *2-3 (D. Mass. Jan. 10, 2022) (relying on both the defendants' fraud and their conversion of assets); B2 Opportunity Fund, LLC v. Trabelsi, No. 17-cv-10043, 2017 WL 1196645, at *2 (D. Mass. Mar. 30, 2017) (relying on both the defendant's fraud and his transfer of assets after the plaintiff sought an injunction). For the reasons discussed above, the Court does not find a strong indication on this record that Defendants have engaged in any such conduct with respect to the assets of Oaks Village or Greenfin, and Easton Mark's fraud claims do not otherwise directly relate to the dissipation or concealment of assets.

## ORDER

For the foregoing reasons, Easton Mark's motion for preliminary injunction (Dkt. 8) is **DENIED**.


SO ORDERED.

/s/ PATTI B. SARIS
Hon. Patti B. Saris
United States District Judge